**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **MARK DANIELS,** | ) | |
| | ) | |
| **Plaintiff,** | ) | |
| | ) | **No. 10 C 5820** |
| | ) | |
| **v.** | ) | |
| | ) | **Magistrate Judge Susan E. Cox** |
| **MICHAEL J. ASTRUE, Commissioner of the** | ) | |
| **Social Security Administration,** | ) | |
| | ) | |
| **Defendant.** | ) | |

<u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Mark Daniels seeks judicial review of the final decision of the Commissioner of the Social Security Administration (the "Commissioner") denying his application for Disability Insurance Benefits ("DIB") under Title II of the Social Security Act.[1]  Plaintiff has filed a motion for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure seeking a judgement reversing or remanding the Commissioner's final decision.  The Commissioner opposes this motion and requests that we affirm his final decision.  For the reasons set forth below, plaintiff's motion for summary judgment is granted in part and denied in part [dkt. 18].

**I.      Procedural History**

On April 20, 2007, plaintiff filed an application for DIB, alleging that he had been disabled since February 12, 2007.[2]  That claim was denied on August 29, 2007.[3]  Upon reconsideration,

---

[1] 42 U.S.C. §§ 405(g), 416(i), 423.
[2] R. at 141-143.
[3] R. at 76

plaintiff's claim was again denied by notice dated February 25, 2008.[4]  Thereafter, plaintiff filed a request for a hearing before an Administrative Law Judge ("ALJ").[5]

On July 1, 2009, an administrative video hearing was held before ALJ Mary Ann Poulose, with the plaintiff appearing in Orland Park, Illinois and the ALJ located in Chicago, Illinois.[6] Following the hearing, the ALJ issued an unfavorable opinion dated July 27, 2009, finding that plaintiff was not disabled under the Social Security Act.[7]  On August 11, 2009, plaintiff filed a request for review of the ALJ's determination with the Social Security Administration's Appeals Council.[8]  On July 16, 2010, the Appeals Council denied the request for review, making the ALJ's July 27, 2009 decision the final administrative determination of the Commissioner.[9]  On September 14, 2010, plaintiff filed this action.[10]

## II.    Factual Background

Plaintiff was fifty years old at the time of the administrative hearing.[11]  The highest level of education he attained was a General Equivalency Diploma.[12] Previous jobs included working in a warehouse, operating a forklift, assembling locomotive parts, and performing landscape work.[13] The record consists of medical documentation and the administration hearing transcript.  We will summarize each.

## A. Medical Documentation

---

[4]R. at 77.
[5]R. at 98.
[6]R. at 10, 23-75.
[7]R. at 10-18.
[8]R. at 6.
[9]R. at 1-5.
[10]*See* Comp. [dkt 1].
[11]R. at 23, 157.
[12]R. at 32.
[13]R. at 32-33.

The record contains medical records related to three conditions: injuries plaintiff suffered after falling off of a ladder, a lower back injury, and depression. There is also documentation from state agency reviewing doctors. We will discuss each category of evidence but only briefly summarize evidence related to the ladder accident, as it does not pertain to any of plaintiff's arguments before the Court.

*1. Injuries as a result of ladder accident*

On October 16, 2006, plaintiff sought medical care at Silver Cross Hospital and was first seen by Rafael R. Castro, M.D.[14] Dr. Castro's notes state that plaintiff fell a distance of approximately eight feet and landed on the left side of his head.[15] Plaintiff complained a severe headache, nausea, and vomiting.[16] Plaintiff also reported to Dr. Castro that he had episodes of confusion.[17] Dr. Castro's initial impressions included, "[p]ossible perforated left tympanum," and a possible skull fracture at the base of his skull.[18] Dr. Castro also noted a history of depression and colitis.[19] Plaintiff was admitted to the hospital.[20]

Following admission into the hospital, plaintiff was examined by several doctors. These doctors noted hearing loss, a possible right temporal lobe contusion, and possible post-concussive sydrome.[21] Magnetic resonance imaging ("MRI") and Computerized axial tomography ("CAT scan") tests were completed.[22] Plaintiff was subsequently released from the hospital and underwent

---

[14]R. at 262.
[15]*Id.*
[16]*Id.*
[17]*Id.*
[18]*Id.*
[19]*Id.*
[20]*Id.*
[21]R. at 268-270.
[22]R. at 292, 300, 302.

follow-up exams in October and December 2006. Ultimately, these follow-up exams revealed, "[e]ssentially stable brain appearance with no definite acute traumatic intracranial hemorrhage…."[23]

## 2. Lower Back Injury

In February 2007, plaintiff sought treatment for an injury to his back that he suffered while lifting a heavy box.[24] Plaintiff complained of low back pain with burning and numbness.[25] It was noted on the medical records that plaintiff had undergone back surgery in 1988.[26] An MRI was completed and plaintiff was seen by Arti Chawla, M.D.[27] Dr. Chawla observed that plaintiff had difficulty bending over but was able to bend to approximately seventy-five degrees.[28] His gait was limited, but he was able to walk.[29] Dr. Chawla noted that the MRI revealed, "mild left-sided herniation of disc at the level of L4-L5 [with] foraminal narrowing."[30] Dr. Chawla wrote that plaintiff had severe pain over the left side of his back and radiation to the buttock.[31] Dr. Chawla stated that plaintiff should be off work and referred him to Joliet Pain Clinic.[32]

On March 6, 2007, Aubrey Linder, PA-C performed a consultation at Joliet Pain Care Center.[33] The report states that plaintiff hurt his back in February 2007 and has had constant pain since that time.[34] Plaintiff rated that pain as a six out of ten.[35] Physician Assistant Linder

---

[23]R. at 302.
[24]R. at 309.
[25]Id.
[26]Id.
[27]R. at 309, 317.
[28]R. at 318.
[29]Id.
[30]R. at 317.
[31]Id.
[32]Id.
[33]R. at 335.
[34]Id.
[35]Id.

determinated that plaintiff suffered from left L4-L5 disk herniation with left lower extremity radiculopathy.[36]  She prescribed a short dose of steroids to help with the pain.[37]  Plaintiff was also prescribed the muscle relaxer Zanaflex and instructed to stay off work.[38]

On March 22, 2007, plaintiff followed up with Physician's Assistant Linder.[39]  Plaintiff reported that he was 80% improved.[40]  Physician's Assistant Linder recommended physical therapy to resolve the remaining pain.[41]  Plaintiff was authorized to return to work as of April 2, 2007.[42]

On June 4, 2007, plaintiff saw Joseph Hindo, M.D.  Dr. Hindo noted that plaintiff had a herniated disc.[43] Dr. Hindo also stated that plaintiff, "has a lump in the upper quadrant."[44] Dr. Hindo referred plaintiff to neurological surgeon George DePhillips, M.D., S.C.[45]

On July 2, 2007, Dr. DePhillips performed a neurosurgical consultation.[46]  He wrote that plaintiff's MRI scan revealed "severe disc degeneration with disc space collapse and narrowing at the L5-S1 level."[47] Mild to moderate disc degeneration was also observed at the L3-L4 level and the L4-L5 level.[48]  Dr. DePhillips noted that plaintiff had a "posterolateral non-instrumental fusion" completed in 1988.[49]  Dr. DePhillips ordered x-rays to examine the fusion.[50]  He also recommended

---

[36]*Id.*
[37]R. at 336.
[38]*Id.*
[39]R. at 337.
[40]*Id.*
[41]*Id.*
[42]*Id.*
[43]R. at 319.
[44]*Id.*
[45]*Id.*
[46]R. at 323.
[47]*Id.*
[48]*Id.*
[49]*Id.*
[50]*Id.*

a caudal epidural steroid injection.[51]  Dr. DePhillips sought to follow-up with plaintiff in one week and recommended that he stay off work during that time.[52]

Also on that date, Dr. DePhillips completed a "Disability Certificate" and indicated on that form that plaintiff was "totally incapacitated."[53]  Dr. DePhillips stated that plaintiff should remain off work until further evaluation.[54]  Subsequently, Dr. DePhillips noted that plaintiff was totally incapacitated seven additional times.[55]

On September 26 and October 29, 2007, plaintiff followed up with Dr. DePhillips regarding his lower back pain.[56]  On each occasion, Dr. DePhillips administered epidural steroid injections, but Dr. DePhillips noted that these injections provided only temporary relief.[57]  Dr. DePhillips recommended physical therapy three times per week for three weeks and indicated that an independent medical evaluation was scheduled with Dr. John Shea.[58]

Dr. Shea's notes state  that an MRI from February 2007 showed subtle disc space herniation on the left at L4-L5 with foraminal narrowing.[59] Dr. Shea also noted decreased sensation and "give-way" weakness in the upper and lower extremities.[60]  Dr. Shea believed that plaintiff could have suffered a back strain related to lifting the heavy box, as he had described.[61]  However, Dr. Shea did

---

[51]*Id.*
[52]*Id.*
[53]R. at 467.
[54]*Id.*
[55]R. at 460-67.
[56]R. at 404-405.
[57]*Id.*
[58]R. at 404.
[59]R. at 453-55.
[60]R. at 454.
[61]R. at 455.

not believe that surgery was necessary.[62]  Dr. Shea did not give an opinion as to whether plaintiff could work.[63]

In March 2009, Alexander J. Ghanayem examined plaintiff and also concluded that surgery was not the best option.[64]  Dr. Ghanayem recommended that plaintiff undergo a pain program.[65]  However, until the plaintiff improved, Dr. Ghanayem recommended that plaintiff stay off work.[66]

On October 29, 2008 plaintiff again followed-up with Dr. DePhillips.[67]  Dr. DePhillips wrote that he explained to plaintiff that he would not be comfortable proceeding with surgery because no other surgeon's agreed that it was appropriate.[68]  He also cautioned plaintiff that surgery had only a fifty percent chance of improving his symptoms.[69]  However, Dr. DePhillips stated that, in his opinion, surgery was a reasonable option.[70]  Dr. DePhillips then stated,  "[plaintiff] remains unemployable and disabled in my opinion."[71]

*3. Depression*

Medical evidence of plaintiff's mental impairments consist of progress notes from psychiatrist Susan Crawford Sherman M.D.[72]  The records reflect that plaintiff reported that he was spending most of his day in his bedroom, isolated from other people.[73]  He stated that he preferred

---

[62]*Id.*
[63]*Id.*
[64]R. at 494.
[65]*Id.*
[66]*Id.*
[67]R. at 437.
[68]*Id.*
[69]*Id.*
[70]*Id.*
[71]*Id.*
[72]R. at 355-56, 484-92.
[73]R. at 487.

to be isolated because he feared mood changes.[74] He also reported to Dr. Sherman that he was angry and depressed.[75] According to Dr. Sherman, plaintiff suffered from major depressive disorder.[76] Dr. Sherman prescribed several medications throughout her treatment of plaintiff, including Prozac.[77]

## 4. State Agency Reviewing Opinions

As part of the disability determination process, state agency reviewing doctors reviewed plaintiff's medical evidence and made assessments of plaintiff's limitations. On August 27, 2007, Richard Bilinsky, M.D. completed an "Illinois Request for Medical Advice" form.[78] Dr. Bilinsky determined that there was insufficient evidence to reach a determination as to disability.[79]

Also on August 27, 2007, Kirk Boyenga, PhD, completed a "Psychiatric Review Technique."[80] Under the section labeled, "medical disposition(s)," Dr. Boyenga checked the box for "Insufficient Evidence."[81] Dr. Boyenga did not make any other notations.[82]

On February 19, 2008, Barry Free, M.D. completed a "Physical Residual Functional Capacity Assessment."[83] The first section of the form required Dr. Free to assess plaintiff's functional limitations.[84] In terms of lifting and carrying, Dr. Free indicated that plaintiff could occasionally lift and/or carry twenty pounds of weight.[85] He also noted that plaintiff could

---

[74]R. at 355.
[75]Id.
[76]R. at 356.
[77]R. at 355-56, 484-92.
[78]R. at 372.
[79]R. at 373.
[80]R. at 374-387.
[81]R. at 374.
[82]R. at 374-387.
[83]R. at 407-414.
[84]R. at 408.
[85]Id.

frequently lift and/or carry ten pounds of weight.[86]  According to Dr. Free, plaintiff could walk about six hours in an eight-hour workday and sit for six hours in an eight-hour workday.[87]  Dr. Free also indicated that plaintiff had an "unlimited" ability to push and/or pull.[88]

In the second section, Dr. Free assessed plaintiff's postural limitations.[89]  Dr. Free opined that plaintiff could frequently balance, kneel, and crouch.[90]  Plaintiff could occasionally climb ramps or stairs, stoop, and crawl.[91]  However, plaintiff could never climb a ladder, rope, or scaffold.[92]

In the third section, Dr. Free assessed manipulative limitations, such as reaching handling, fingering and feeling.[93]  Dr. Free concluded that there were no manipulative limitations established.[94] Dr. Free also found no established visual, communicative, or environmental limitations.[95]

In the comments portion of the form, Dr. Free listed the medical records he examined.[96] These included the February 2007 MRI and Dr. Chawla's notes.[97]  Dr. Free also noted plaintiff's history of back surgery in 1988.[98]  However, there is no indication that Dr. Free saw any reports from Dr. DePhillips.[99]

---

[86]*Id.*
[87]*Id.*
[88]*Id.*
[89]R. at 409.
[90]*Id.*
[91]*Id.*
[92]*Id.*
[93]R. at 410.
[94]*Id.*
[95]R. at 410-11.
[96]R. at. 414.
[97]*Id.*
[98]*Id.*
[99]*Id.*

On February 21, 2008, Jerrold Heinrich completed another "Illinois Request for Medical Advice."[100]   Dr. Heinrich was consulted to reconsider Dr. Boyenga's Psychiatric Review Technique.[101]   Dr. Henirich affirmed Dr. Boyenga's assessment and wrote that there continued to be insufficient medical evidence to find a mental disability.[102]   Dr. Heinrich stated that the medical evidence contained only "a suggestion of a history of depression."[103]

## B. Administrative Hearing

On July 1, 2009, an administrative hearing was held before ALJ Poulose.  The plaintiff, who was representative by counsel, and a vocational expert testified at the hearing.[104]

### 1. Plaintiff's Testimony

Plaintiff testified that he lived at home with his wife and two teenage children.[105]  He stated that the last job he held was in April 2007, building throttle and brake levers for locomotives.[106]  He explained that he hurt his back lifting a forty or fifty pound box.[107]  Since injuring his back, he has not returned to work.

Prior to working on the train parts, plaintiff described the jobs he held as "pretty physical."[108]  For example, he operated a forklift and worked in a warehouse.[109]  Plaintiff testified that he was

---

[100]R. at 416-17.
[101]*Id.*
[102]R. at 417.
[103]*Id.*
[104]R. at 25-75.
[105]R. at 31.
[106]R. at 32.
[107]*Id.*
[108]R. at 33.
[109]*Id.*

forced to leave the forklift and warehouse jobs because of "problems with his head."[110] Specifically, plaintiff said that he, "couldn't deal with people."[111]

When asked to summarize why he was unable to work, plaintiff stated three reasons: his back, his head, and his arm.[112] He described the pain in his back as traveling down his back into his legs on both sides.[113] He stated that anytime he moves, he hears his back "crack."[114] Plaintiff explained that sitting for prolonged periods of time exacerbated his pain and that he preferred to lie in his waterbed.[115] He testified that he could only stand in a line for about ten minutes.[116] When asked what he could lift, plaintiff stated that he could lift a twelve-case of soda pop or a gallon of milk, but not a twenty-four-case of soda pop.[117]

As for mental issues, or his "head," plaintiff stated that he spent most days in his bedroom.[118] He said he does not like being around other people or taking orders.[119] Plaintiff said that he gets angry, so he tries to avoid being around people as much as possible.[120] He explained that he wants to stay in his bedroom because of "fear" and to avoid "trouble."[121] Therefore, he testified that he leaves his home only three or four times a month.[122] However, he did state that he goes fishing once a week at a pond two houses away from his.[123]

---

[110]*Id.*
[111]*Id.*
[112]R. at 46.
[113]*Id.*
[114]*Id.*
[115]R. at 36-37.
[116]R. at 37.
[117]R. at 36.
[118]R. at 35.
[119]R. at 46.
[120]R. at 45.
[121]R. at 57-58.
[122]R. at 38.
[123]R. at 38-39.

Plaintiff also testified that he had trouble with his left hand.[124]  He explained that he cut his hand and, as a result, he was unable to bend his thumb, ring, and pinky fingers.[125]  According to plaintiff, this makes it difficult to hold things, like a cup of coffee, pick things up, like coins, and feel things.[126]  When he assembled train parts, he explained that there were some elements of that job that he was unable to do because of his hand.[127]  However, plaintiff explained that he made an arrangement with a coworker that was unable to carry heavy items, where plaintiff would carry heavy items and the coworker could complete the tasks that required fine motor skills.[128]

In terms of his daily activities, plaintiff testified that he remains in his bedroom most of the day.[129]  He is able to care for his two dogs, but this seemed to entail only opening the door to let the dogs outside.[130]  Occasionally, he tries to do the laundry and cook dinner, but he does not grocery shop, play with his children, or mow the lawn.[131]

*2. Vocational Expert's Testimony*

Next, Vocational Expert ("VE") Lee Knutson testified.[132]  The VE was asked to opine whether an individual that was limited to light work, no interaction with the public, and only occasional interaction with co-workers could perform plaintiff's past work.[133]  The VE stated that such an individual could not perform plaintiff's past work.[134] However, the VE stated that there was

---

[124]R. at 33, 46.
[125]R. at 33-34, 42.
[126]R. at 41-42.
[127]R. at 46-47.
[128]R. at 47.
[129]R. at 57.
[130]R. at 37-38.
[131]R. at 35.
[132]R. at 65-74.
[133]R. at 67.
[134]*Id.*

other work in the regional economy that a person with such limitations could complete.[135]  The VE stated that with such limitations, there were approximately 35,000 jobs available in the region of Illinois, Wisconsin, and Indiana.[136]  If a limitation to the left hand was added, the VE stated that the number of jobs would be, "significantly limited."[137]

Next, the ALJ presented a hypothetical individual that must work a sedentary job with no public interaction and only occasional interaction with co-workers.[138]  The VE stated that there would be about 5,300 jobs available in the region.[139]  The VE stated that if, in addition, the individual could only occasionally use his left hand, then the number of jobs would be reduced significantly.[140]

## III.    ALJ's Decision

In her June 27, 2008 decision, ALJ Poulose determined that plaintiff was not disabled as defined in the Social Security Act and, therefore, was not entitled to any DIB.[141]  In reaching this conclusion, the ALJ followed the five-step evaluation process outlined in the Social Security Act regulations (the "regulations").[142]  Under the regulations, the ALJ must consider: (1) whether the claimant is presently engaged in any substantial gainful activity; (2) whether the claimant has a

---

[135]*Id.*
[136]R. at 68.
[137]R. at 68-69.
[138]R. at 69.
[139]R. at 69-70.
[140]R. at 70-71.
[141]R. at 18.
[142]See 20 C.F.R. § 404.1520.

severe impairment or combination of impairments; (3) whether the claimant's impairment meets or equals any impairment listed in the regulations as being so severe as to preclude gainful activity; (4) whether the claimant is unable to perform her past relevant work; and (5) whether the claimant is unable to perform any other work existing in significant numbers in the national economy.[143] A finding of disability requires an affirmative answer at either step three or step five, while a negative answer at any step other than step three precludes a finding of disability.[144]

After explaining the applicable law, ALJ Poulose began the five step evaluation process. At step one, the ALJ found that plaintiff had not engaged in gainful activity between the alleged onset date, February 12, 2007, through his date last insured, December 31, 2007.[145]

At step two, the ALJ determined that plaintiff suffered from two severe impairments: degenerative disk disease and major depressive disorder.[146] The ALJ stated that the left-hand injury non-severe because of a lack of medical evidence.[147] The ALJ also found that plaintiff was able to work at his previous job despite this alleged injury.[148]

At step three, the ALJ concluded that plaintiff did not have an impairment or combination of impairments that met or medically equaled one of the listed impairments in the regulations.[149] The ALJ noted that plaintiff's degenerative disc disease and major depressive disorder were not sufficiently severe to meet the Listings.[150]

---

[143]20 C.F.R. § 404.1520(a)(4)(i)-(v).
[144]*Young v. Sec'y of Health & Human Servs.*, 957 F.2d 386, 389 (7th Cir.1992).
[145]R. at 12.
[146]R. at 13.
[147]*Id.*
[148]*Id.*
[149]*Id; see* 20 C.F.R. §§ 404.1525, 404.1526.
[150]R. at 13.

Before moving to step four, the ALJ made an RFC finding. The ALJ concluded that plaintiff, "had the residual functional capacity to perform light work as defined by 20 CFR 404.1567(b), except with only occasional interaction with co-workers, and no interaction with the public."[151] In support of this RFC finding, the ALJ summarized the record.[152] In doing so, the ALJ found that plaintiff's "medically determinable impairments could reasonably be expected to cause the alleged symptoms; however, [plaintiff's] statements concerning the intensity, persistence and limiting effects of these symptoms are not credible to the extent they are inconsistent with the [RFC]."[153]

In determining that plaintiff could complete light work, the ALJ was persuaded that Dr. Hindo and Physician's Assistant Linder cleared plaintiff to return to work.[154] The ALJ found support in Dr. Shea's consultative examination, which found no permanent neurological deficits and did not recommend surgery.[155] The ALJ stated that the state agency reviewing opinions supported the RFC, but then noted that new evidence submitted after those opinions were made "render the claimant more disabled than found by the state agency."[156]

As for Dr. DePhillips's, who found the plaintiff disabled and recommended surgery, the ALJ assigned his opinion minimal weight.[157] The ALJ noted that Dr. DePhillips's opinion that plaintiff could not work did not have support of substantial medical evidence.[158] Also, the ALJ

---

[151]*Id.*
[152]R. at 14-17.
[153]R. at 14.
[154]R. at 15; *See* R. at 320, 337
[155]R. at 15.
[156]R. at 16.
[157]*Id.*
[158]*Id.*

stated that Dr. DePhillip's use of the word "disabled" does not necessarily have the same definition utilized by the regulations.[159]

The ALJ assigned the opinion of Dr. Ghamyem "some weight."[160] Although Dr. Ghamyem stated that plaintiff should stay off work, the ALJ made the assumption that Dr. Ghamyem recommendation was that plaintiff stay off of his then current work, which was required medium, not light, exertion.[161] Ultimately, however, the ALJ stated that it was her responsibility to determine whether plaintiff was capable of finding work.[162]

The ALJ believed plaintiff's daily activities also supported the RFC finding. She noted that plaintiff "could independently cook dinner for his family, do laundry, and care for his dog."[163] The ALJ believed this was inconsistent with his claim that he could stand and walk for only ten minutes at a time.[164] Additionally, the ALJ found that plaintiff's claim that he had disabling pain was inconsistent with his testimony that he could read books and had the ability to walk to a nearby fishing pond.[165]

As for the mental impairment of major depressive disorder, the ALJ stated that although there was consistent reporting by Dr. Sherman that plaintiff had a variety of symptoms, April 2008 treatment notes indicated that plaintiff was improving.[166] The ALJ referenced Dr. Sherman's assessment that plaintiff had other strong mental indicators, such as above average intelligence and

---

[159]*Id.*
[160]R. at 16.
[161]*Id.*
[162]*Id.*
[163]*Id.*
[164]*Id.*
[165]*Id.*
[166]*Id.*

a good memory.[167]  The ALJ explained that limiting only social interaction was consistent with the plaintiff's testimony that he read books, went fishing, and assisted with some household chores.[168]

With the RFC finding complete, the ALJ moved to step four and found that plaintiff was unable to perform past relevant work.[169]  At step five, consistent with the VE's testimony, the ALJ found that there were jobs that existed in significant numbers in the national economy that claimant could have performed.[170]  Therefore, the ALJ concluded that plaintiff was not disabled.[171]

## IV.    Standard of Review

The District Court performs a *de novo* review of the ALJ's conclusions of law, but the ALJ's factual determinations are entitled to deference.[172]  The Court will uphold the ALJ's decision if substantial evidence supports the findings of the decision and if the findings are free from legal error.[173]  Where reasonable minds differ, it is for the ALJ, not this Court, to make the ultimate finding as to disability.[174]  However, the ALJ must make an accurate and logical connection from the evidence to the ultimate conclusion.[175]  While, the ALJ is not required to discuss every piece of evidence, the ALJ must minimally articulate his reasons for crediting or discrediting evidence of disability.[176]

## V.    Analysis

---

[167]*Id.*
[168]*Id.*
[169]R.at 17.
[170]R. at 17-18.
[171]R. at 18.
[172]*Prochaska v. Barnhart*, 454 F.3d 731, 734 (7th Cir. 2006).
[173]42 U.S.C. § 405(g); *Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[174]*Cass v. Shalala,* 8 F. 3d 552, 555 (7th Cir. 1993).
[175]*Dixon v. Massanori*, 270 F. 3d 1171, 1176 (7th Cir. 2001).
[176]*Clifford v. Apfel*, 227 F.3d 863, 870 (7th Cir. 2000).

Plaintiff raises three arguments. First, plaintiff argues that the ALJ erred in disregarding his hand injury. Second, plaintiff claims that the ALJ's conclusion that he could perform light work is not supported by substantial evidence. Third, plaintiff argues that the RFC fails to properly account for his psychological limitations.

## A. Hand Injury

Plaintiff's initial argument is that the ALJ incorrectly concluded that his hand injury is non-severe. The ALJ reasoned that the injury was non-severe because of a lack of medical evidence and because plaintiff was able to work at the train assembly job with the alleged injury. Plaintiff argues this reasoning is flawed and that the mistake is significant because the VE testified there would not be a significant number of jobs if this impairment was taken into account.

Pursuant to the regulations, an impairment is deemed severe if it significantly limits the ability to do basic work activities.[177] Handling is considered a basic work activity.[178] However, the determination that an impairment is severe is only utilized at step two of the ALJ's analysis.[179] If the ALJ classifies one impairment as severe, the analysis continues to step three.[180] Therefore, incorrectly classifying an impairment as non-severe is not reversible error, so long as the ALJ identified some other impairment as severe and continued with the sequential process.[181]

Here, the ALJ classified plaintiff's degenerative disk disease and major depressive disorder

---

[177]20 C.F.R. § 404.1521(a).
[178]20 C.F.R. § 404.1521(b).
[179]20 C.F.R. § 404.1520(a)(4)(i)-(v).
[180]20 C.F.R. § 404.1520(a)(4)(ii).
[181]*Perez v. Barnhart,* No. 02 C 6876, 2003 WL 22287386, *9 (N.D. Ill. Sept. 30, 2003); *See also Maziarz v. Secretary of Health & Human Servs.,* 837 F.2d 240, 244 (6th Cir. 1987).

as severe impairments. The ALJ then continued on to step three in accordance with the regulations. Therefore, even if the hand injury should have been deemed a severe impairment, this alone is not reversible error. Furthermore, as we note more extensively *infra,* there is no medical evidence concerning plaintiff's left hand injury.

In his reply brief, plaintiff concedes that a failure to classify the injury as non-severe alone does not justify remand, but he argues that the ALJ failed to give the hand injury full consideration when making the RFC determination. The ALJ must consider all impairments, including non-severe impairments, and their combined effect when determining disability.[182] However, when considering the plaintiff's symptoms, the ALJ is required to follow a two step process.[183] First, the ALJ must determine whether there is an underlying medically determinable impairment that could reasonably be expected to produce the claimant's symptoms.[184] In determining whether an underlying medically determinable impairment exists, the ALJ looks for medically acceptable clinical and laboratory diagnostic techniques.[185] We note that, "[n]o symptom or combination of symptoms can be the basis for a finding of disability, no matter how genuine the individual's complaints may appear to be, unless there are medical signs and laboratory findings demonstrating the existence of a medically determinable physical [impairment]."[186] If an underlying medically determinable impairment exists, then the ALJ proceeds to the second step, which requires the ALJ to evaluate the limiting effect of the impairment.[187]

---

[182]*Ridinger v. Astrue*, 589 F. Supp. 2d 1004 (N.D. Ill. 2008).
[183]SSR 96-7p.
[184]*Id.*
[185]*Id.*
[186]*Id.*
[187]*Id*

Here, the ALJ discounted the plaintiff's testimony regarding the limiting effect of his hand injury because there was no medical evidence in the record.[188]  Plaintiff, however, argues that there was medical evidence of an impairment to his hand.  He points us to Dr. Shea's notes, which stated decreased sensation in "the entire left upper and lower extremities."[189]  "Give-way" weakness in the upper and lower extremities was also documented.[190]  However, we agree with the Commissioner that this notation is far too vague for the ALJ to conclude that plaintiff had a medically determinable impairment of his left hand.  The Court's review of the medical documentation does not reveal a single reference to plaintiff's left hand, and plaintiff does not refer us to such a reference.  Therefore, we believe the ALJ was correct in her decision to not consider plaintiff's left hand impairment when determining his RFC.[191]

In addition, the ALJ disregarded the hand injury because plaintiff was able to work the train assembly job despite this injury.  Plaintiff claims that the ALJ misconstrued the plaintiff's testimony.  Plaintiff argues that he was able to do this job, despite his injury, because he made an arrangement with another worker that plaintiff would carry heavy boxes and the other worker would complete the tasks requiring fine motor skills.  Now that plaintiff has the back disorder, such an arrangement is not possible.  However, we have already determined that the ALJ was correct in not evaluating the limiting effects of plaintiff's hand injury because there was no medically determinable impairment.  Therefore, it is not necessary for us to consider whether the ALJ misunderstood plaintiff's testimony regarding his hand injury.

---

[188]R. at 13.
[189]R. at 454.
[190]*Id.*
[191]*Denton v. Astrue*, 596 F.3d 419, 423-24 (stating, "[plaintiff] bears the burden of producing medical records showing her impairment, and if she never sought medical treatment for a condition, then she cannot meet that burden."

**B. Physical Limitations**

Plaintiff next argues that the ALJ's RFC determination in terms of his physical limitations is flawed because it is not supported by substantial evidence. First, plaintiff finds fault with the ALJ's conclusion that plaintiff's daily activities were inconsistent with his subjective allegations. The ALJ stated that plaintiff could "independently cook dinner for his family, do laundry, and care for his dog."[192] She found this inconsistent with his claim that he was unable to stand or walk for longer than ten minutes. Additionally, the ALJ noted that the plaintiff's allegations of disabling pain were inconsistent with his ability to read books and walk to a nearby pond to fish. The Commissioner contends that these conclusions are reasonable.

Here, we agree with plaintiff and find that the ALJ did not make an accurate and logical connection from the evidence to the ultimate conclusion.[193] The Court fails to see how caring for his dogs, which plaintiff described as no more than opening a door to let the dogs out of the house,[194] is inconsistent with the claim that he could not stand for more than ten minutes. Similarly, plaintiff stated, "I try to do some laundry if I can. I try to cook dinner sometimes."[195] We also fail to understand how this is inconsistent with plaintiff's claim that he cannot stand for more than ten minutes. Most perplexing is the ALJ's conclusion that plaintiff's ability to read a book is inconsistent with his claim that he is in severe pain. The ALJ failed to adequately articulate why the ability to read a book contradicts plaintiff's claim that he is in severe pain. We note that the Seventh Circuit has specifically stated that limited daily activities do not contradict a claim of

---

[192]R. at 15.
[193]*See Dixon*, 270 F. 3d at 1176.
[194]R. at 37-38.
[195]R. at 35.

disabling pain.[196]  Therefore, we find that the ALJ did not build an accurate and logical bridge from the evidence, that plaintiff could complete certain daily activities, to the conclusion, that plaintiff's subjective complaints were inconsistent with these daily activities.

Second, plaintiff points to the ALJ's comment regarding the state agency reviewing doctors. These doctors, specifically Dr. Free, found plaintiff capable of performing light work.  However, the ALJ noted that additional evidence was submitted since these opinions were rendered that made plaintiff more disabled than found by the state agency reviewers.  It does not follow, plaintiff argues, that the ALJ then concludes that plaintiff is capable of performing light work.

Again, we agree with plaintiff.  If the state agency reviewing doctors concluded that plaintiff was capable of completing light work, but additional evidence submitted after that determination rendered plaintiff more disabled, we do not understand how the ALJ concluded plaintiff was capable of completing light work.  Again, the ALJ failed to build a logical bridge from the evidence to her conclusion.  On remand, the ALJ should more thoroughly explain this apparent discrepancy.

Plaintiff's third argument is more general: the ALJ's finding that plaintiff could complete light work is not supported by substantial evidence.  As we have stated, the ALJ's conclusions must be supported by substantial evidence.[197]  Substantial evidence is defined as "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."[198]

Here, the ALJ relied on the recommendations of Physician Assistant Linder and Dr. Hindo

---

[196]*Villano v. Astrue*; 556 F.3d 558, 563 (7th Cir. 2009)
[197]*Steele v. Barnhart*, 290 F. 3d 936, 940 (7th Cir. 2002).
[198]*Richardson v. Perales*, 402 U.S. 389, 401 (1971).

that plaintiff could return to work. The ALJ acknowledged that Drs. DePhillips and Dr. Ghanayem stated that plaintiff should stay off work, but the ALJ stated her belief that these directions were related to plaintiff's past work - which is classified as medium work. The ALJ found this to be consistent with her finding because she concluded that the plaintiff could not complete his past work. The ALJ also noted that it was ultimately for her to decide whether a claimant can work.

The Court notes that it is ultimately for the ALJ to determine whether a claimant is disabled and that a statement by a physician that the claimant is disabled is not controlling.[199] Nonetheless, the statement by Dr. DePhillips that plaintiff is "unemployable" should be considered by the ALJ.[200] Furthermore, although the ALJ reasoned that the statements made were likely regarding plaintiff's past work, this does not *support* a finding that the plaintiff can complete light work. In other words, while the ALJ's inference does not contradict her conclusion, it also does not support her RFC finding.

The ALJ was required to articulate her reasoning for the conclusion that plaintiff could complete light work. The regulations define "light work" as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."[201] Nowhere in the ALJ's decision do we see an explanation that the plaintiff could lift and carry ten pounds frequently. Instead, the only discussion regarding his ability to lift and carry is the discussion of plaintiff's testimony that he could lift a twelve-case of soda pop or a gallon of milk. This does not establish that plaintiff could complete the requirements for light work.

---

[199]20 C.F.R § 404.1527(e)(1).
[200]*See Frobes v. Barnhart,* 467 F.Supp.2d 808, 819 (N.D. Ill 2004).
[201]SSR 83-10.

In fact, the only assessment of what activities plaintiff could complete, consistent with the requirements of light work, in the entire record is the "Physical Residual Functional Capacity Assessment" completed by Dr. Free. As we have noted, the ALJ found that evidence submitted after Dr. Free's assessment rendered the plaintiff more disabled. Therefore, we are unsure how the ALJ reached the conclusion that plaintiff could complete light work. Indeed, Dr. Free rendered his opinion without the aid of Dr. DePhillips's assessment. This is significant because Dr. DePhillips's conclusion about plaintiff's condition was the most severe out of all the doctors that examined plaintiff. Furthermore, when an ALJ evaluates a nonexamining physician's opinion, such as Dr. Free's opinion, the ALJ is obligated to consider the extent to which the nonexamining opinion considered all of the pertinent evidence, such as opinions from treating and examining physicians.[202] Therefore, remand is necessary so that the ALJ can more thoroughly articulate how she reached her conclusions.

## C. Psychological Limitations

Finally, plaintiff argues that the ALJ incorrectly assessed plaintiff's mental limitations. He asserts that while it was appropriate to eliminate plaintiff's contact with the public and limit his contact with co-workers, an appropriate RFC would accommodate for additional psychiatric limitations.

Plaintiff in this case had a documented history of depression, anger issues, and a fear of leaving his home. The ALJ found that the plaintiff had moderate limitations in social functioning and mild limitations in the area of activities of daily living. To remedy these problems, the ALJ

_____

[202] 20 C.F.R. § 404.1527(d)(3).

limited plaintiff's interaction with co-workers and eliminated his contact with the public. The Commissioner argues that this is sufficient and that plaintiff identifies no evidence that plaintiff had additional mental limitations that were not reasonably accommodated by the ALJ's RFC.

Again, we find that the ALJ did not adequately explain her reasoning here. Plaintiff stated in his testimony that he has fear of leaving his home. This fear was stated in his testimony and documented by Dr. Sherman. Further, the ALJ does not directly discredit this fear. However, the ALJ fails to explain how limiting plaintiff's interaction with coworkers and the public would abate this fear. Moreover, the ALJ states that plaintiff had moderate limitations in social functioning, but it is not clear how the ALJ reached this conclusion. For example, it is not clear why the ALJ concluded that plaintiff's social functioning was moderately limited instead of markedly. As with the physical limitations, we find that the ALJ has not built the accurate and logical bridge from the evidence to her conclusion.[203]

Additionally, plaintiff argues that consultation of a medical expert was necessary in this case. We note that an ALJ is not permitted to "play doctor" or make independent medical conclusions.[204] Instead, the ALJ must base her conclusions on the evidence.[205] If necessary, the ALJ may consult a medical expert.[206] However, we are mindful that it is within the ALJ's discretion to consult a medical expert.[207] At this time, we remand only so that the ALJ can more adequately articulate her reasoning. We do not conclude that the ALJ has "played doctor" in this instance because we are simply unclear how the ALJ reached her conclusions. However, if the ALJ

---

[203]*See Dixon*, 270 F. 3d at 1176.
[204]*Clifford,* 227 F.3d at 870; *See also Blakes ex rel. Wolfe v. Barnhart*, 331 F.3d 565, 570 (7th Cir. 2003).
[205]*Craft v. Astrue,* 539 F.3d 668, 675-78 (7th Cir. 2008); 20 CFR § 404.1527(c).
[206]20 CFR § 404.1527(f)(2)(ii).
[207]*See Luna v. Shala*, 22 F.3d 687, 692-93 (7th Cir. 1994).

is unable to reach a conclusion without making her own independent medical conclusion, then testimony from a medical expert may be necessary.[208]

## VI.    Conclusion

For the reasons set forth above, plaintiff's motion for summary judgment is granted in part and denied in part [dkt. 18]. We, therefore, remand the case to the Social Security Administration for further proceedings consistent with this opinion.

**IT IS SO ORDERED**.

**ENTERED: <u>August 4, 2011</u>**

**UNITED STATES MAGISTRATE JUDGE**

**Susan E. Cox**

---

[208]*Blakes ex rel. Wolfe*, 331 F.3d at 570.